Good morning, Your Honors. Ruby Lieberman for the petitioner, Sarah Karingithi. May it please the Court, there are three issues I would like to address in this asylum case this morning. The first is the BIA's mistake of law regarding the one-year deadline. The second is the evidence that compels a reversal of their denial of withholding. And the third are the Supreme Court and BIA cases that I identified in my 28J letter, the Supreme Court case of Pereira v. Sessions, and the BIA case of matter of Bermudez-Cota, which I understand has now been appealed to this Court. In Pereira, the Court said that the notice to appear, the NTA, that triggers the case is not does not vest jurisdiction with the Court if it does not state the time and date of the hearing. And in this case, Ms. Karingithi's NTA does not state the time and date of her hearing. May I just inquire a couple of points on that? The first one is more procedural, and that is, obviously, this wasn't raised before the BIA, given the timing of these cases. So no fault of Ms. Karingithi or her counsel. But do we have jurisdiction to consider it now, or would we need to remand it to the BIA? Well, I believe this Court always has jurisdiction to consider subject-matter jurisdiction. In the alternative, it could be remanded to the BIA. Ms. Karingithi did file a motion to reopen with the BIA based on Pereira. That was on July 17th, and that is still pending. We haven't issued a decision. And, in fact, I would say that in this case, if her motion was issued, she would have a very strong cancellation of removal case based on her U.S. citizen, autistic daughter, and her marriage to a U.S. citizen. And those things were all laid out in the motion to the BIA. Why wouldn't, though, as a practical matter, looking at Bermuda's Cota, if someone doesn't get notice with the — if the initial notice doesn't give you a date and time, but she showed up for the hearing, right? That's correct. So why wouldn't Bermuda Cota's control? It's the plain language of Pereira. That is what the Supreme Court said, that it does not vest the Court with subject-matter jurisdiction. And that is not something that is based on notice, but is based on the statutory requirements of the notice to appear. And so you don't think that Pereira is really limited to this — this stop-clock kind of situation that was involved there? That is correct. But also I would say that even under Bermuda's Cota, I think Ms. Karandithi might get her NTA terminated and a new NTA, because in Bermuda's Cota, the BIA focused on the fact that, in that case, the alien was not applying for cancellation of removal, and, therefore, the stop-time rule that's triggered by the NTA did not apply. However, as I said, in Ms. Karandithi's case, she would have a very strong case for cancellation of removal, and we did argue that in our motion to the BIA. Thank you. The next thing I wanted to discuss is the one-year rule. And since the BIA declined to make a credibility finding, we presume Ms. Karandithi is not going to be able to be credible. And so the undisputed — Well, the BIA, interestingly, it said, well, we don't have to — we don't have to decide whether the IHA's credibility findings are — but then when it got to the question of voluntary departure, it did find her not credible. It did find, for example, that her marriage was a sham marriage. So there are findings that go to somewhat to credibility. They just don't go to the questions of asylum. That's exactly what I saw. And that did puzzle me. But I do see that they accepted all of her facts, as stated, in their determination for the one-year deadline. And the only place that they questioned her facts was to adopt the IJ's finding that at her tourist visa interview, she had said she was married when she was not. And on that basis, the judge said she was not credible in her voluntary departure, and the BIA saw no reason to reverse that decision. But in terms of making the one-year decision and in terms of the withholding of removal case, they accepted her testimony as factually accurate and made their decision based on law without any disputed facts. Well, the question as to whether or not she lied in that initial visa application as to whether she was married or not, that was relevant to the IJ, only to the extent the IJ considered an earlier lie in evaluating the credibility of her story that bore on cancellation of removal. So I can understand how the BIA could simultaneously say, well, she appears to have lied with respect to her marriage, but then for purposes of its decision, treat as true everything that was directly relevant to her cancellation or removal question. That was a softball. Oh, thank you. I guess that's why I didn't follow. I'm not expecting. Yes, so she did say something that was not true at her tourist visa interview about being married. She explained why she said that, and the BIA found that that only related to the visa application. Assuming everything that she says with respect to what's in front of us right now, assuming everything's true, how do you get where you need to get? Okay, great. So the undisputed facts, then, are that seven months after she entered the U.S., she married a U.S. citizen, and they went about filing the applications for her legal status in the U.S., the visa petition, the application to adjust status to permanent resident. And before they filed those, they went to talk to a consultant, not an attorney, but a consultant, and they said, you know, we're looking into asylum because probably she's afraid to go back. And the consultant said, you don't need to apply for asylum. You can apply for adjustment of status based on marriage to a U.S. citizen. And the judge even says that that's not necessarily bad advice. And I would say that that's very reasonable advice. I would say, in fact, any reasonable person in her ---- But if we get to there, that only gets us to the eligibility to apply for asylum. Yes. Right. You've still got problems with, okay, what's the story she's telling about what happened to her before she comes to this country, and why she has a fear of going back? Yes. I think the eligibility for asylum is pretty important in that the BIA in this case recognized that, based on the record, her fear could be well-founded, and also that her ---- the harm she feared would be on a protected nexus. So it seems to me they're saying, well, we think she'd be eligible for asylum, but we don't care because she didn't meet the one-year deadline. You don't qualify for withholding? Yes. I also believe that we qualify. Well, that's a higher standard. That's a higher standard. And it's the same fact. So if you're just telling us that all of this turns on whether or not she's going to satisfy the one-year criteria for asylum, then you may be conceding that she's not eligible for cat relief or withholding. I thought you were arguing withholding. I'm definitely arguing. Okay. So in this case, we have a Kikuyu woman who, for one thing, when she was in high school was in a locked-down school. Your client is in her 40s. She is a mother. She has been at least in a common-law marriage, and maybe two marriages.  And why would anybody in Kenya have interest in performing FGM on her at this stage? The BIA says, look, it looks like it's only maybe about a third of women. It doesn't appear that they would have any interest in a woman of her age who is a mother. So what is wrong with the – what compels a contrary conclusion? And I don't mean to be piling on, but I want to make the question as hard as possible so that you confront everything all at once. And she's Christian, and the uncle, who was apparently a member of the Mangeki organization that was so active in it, he appears to be dead. Okay. And then you can add to that that this was 16 years ago with respect to the women in Kiambu, which is not necessarily this individual. So you have now kind of a larger fact pattern. Yeah. So you've got to confront all of that. So do your best. So we know that her mother was subjected against her will to FGM as an adult. We know that her aunt was subjected to FGM when she was 65 years old. That's against her will. And her mother refers to another woman who was 70 when she was subjected to FGM. And we have a statement that's much publicized from Mangeki that they believe all Kikuyu women between the ages of 13 and 65 should be circumcised. I do see that I'm out of time now, Your Honors. Thank you. Thank you very much. I'll give you a minute for rebuttal. Oh, thank you. Keep that in mind. Thank you. Thank you. Good morning, and may it please the Court. Greg Mack, Counsel for the Respondent, the Attorney General of the United States. We urge the Court to deny the petition for review, and I will focus my limited time on the withholding of removal claim. That seems to be the one issue that's most pertinent here. And as the Court is aware, on September 25th, the government submitted a supplemental citation letter, a 28-J letter, the unpublished decision from the Court in the Mena case, where the panel of this Court concluded that FGM is traditionally imposed on younger women in Kenya. So that's directly on point. And I don't believe the petitioner responded to our 28-J letter at all. I think overall, I think petitioner had what other women who were able to avoid FGM in Kenya, a mother who opposed FGM, a mother who had been scarred and traumatized by FGM herself. Petitioner points to the 70-year-old woman who had FGM enforced on her, but at 5, I believe it's page 598 of the record, it notes that her husband colluded with other women to impose FGM upon her. So as to older women, there seems to be an element of family or tribe or religion with respect to the imposition of FGM, where in this case, those things aren't apparent here. And of course, the record doesn't compel a contrary conclusion here. The record also points out, at page 930 of the record, the State Department also points out that FGM is traditionally imposed on younger females. So if there's no further questions, we urge the Court to deny the petition for review. What's your position on Pereira? The position on Pereira is, as the Court noted, it hasn't been exhausted here and there's really no prejudice here because she did indeed show up for the subsequent hearing, so where's the prejudice and where's the harm? And Pereira, I think, is clearly limited to the facts of the case. It was dealing with the statutory construction of the NTA rule and the statutory rule with respect to stop time. The regulations tell the immigration judge when the immigration judge has jurisdiction over a removal case and that's with the filing of the NTA. But again, there's no prejudice or harm here. That could have been raised before the board because the NTA was available to the petitioner below. And if they wanted to raise that claim, they could have raised it before the board and the board could have corrected it. But if it goes to a subject matter jurisdiction as opposed to personal jurisdiction, then it can be raised at any time. Well, this isn't personal jurisdiction. In constitutional claims, even though the board can rule on constitutional claims, it can still require that procedural errors be raised to it, so it has an opportunity to correct that. So we're not talking about personal jurisdiction. We're talking about the court's overall subject matter jurisdiction. That's right, which is why I'm suggesting that it can be raised at any time. Well, not a procedural error that the board has an opportunity to correct, Your Honor. If the board has an opportunity to correct it, it should be afforded that opportunity to do so before it comes to this court and says, well, they have a defective NTA. The board could have clearly remedied that if the issue had been raised to the board. And that's with respect to 8 U.S.C. Section 1252 D.1 that says the board is entitled to have issues exhausted before the person comes to the court of appeals. Assume for a moment that Pereira applies in this circumstance, which, of course, it may not. But assume for a moment that it does. That means that up until now, there's been no subject matter jurisdiction in the BIA. And so you say BIA can cure. Well, what's it going to do to cure if that's the problem? Well, what the BIA can do is then have the proceedings restarted if that's the error. Or they can go to the prejudices and say, well, how were you prejudiced by not having an NTA with the dates and time in it because you showed up at subsequent hearings? But if they restart, it sounds as though we will be in a somewhat different position, including with evidence that will at least give a plausible argument for withholding of removal that was not in front of the board at that time.  It certainly would be a different proceeding assuming the facts of your question, Your Honor. But I think that also, and I think as we pointed out in some of our papers, that if you go back and reopen all these proceedings, it means not only that the people that were denied relief would get a chance to have new proceedings, the people who were actually granted relief have to go back. No, you're arguing Pereira, and I asked you to assume that Pereira applies here, which it may not. But I'm asking your question about curing if it applies because I'm not sure it's easy to cure. I've got a second question. Pereira to one side. Should we wait to see what happens with the motion to reopen? I'd say no. I think you go forward with you at least have the withholding issues to resolve in this case. So I don't think you should wait for the board to resolve the motion to reconsider because the petitioner can always come to this court and ask the court to review if the board denies the motion to reconsider, the petitioner can come to this court and ask the court to review that. So your suggestion is that we would proceed now, address one way or the other the Pereira issue, and then if the motion to reopen is granted? Well, I would say not address the... You see what I'm saying? I think you deny on the merits the Pereira issue because of the prejudice and exhaustion issues and then reach the substance of this case of the withholding and asylum issues. You know, if we're going to reach the Pereira issue, I'm quite uncomfortable given the state of briefing in this case. I mean, it's a serious issue and we really don't have much in the papers here to argue it either side. I mean, I can kind of make up the arguments on both sides. I can see it. But we really don't have much. True. And I think the court had denied the motion to continue the case pending, I guess, the motion to reconsider. And I think if the court wants supplemental briefing on the Pereira issue, I think we're both prepared and capable to do that. All right. Well, we'll take it all under consideration, given your argument as well as the argument from Ms. Karangithi. Thank you. You have a minute for rebuttal. Thank you, Your Honor. In this case, I want to point out that after Ms. Karangithi returned from school, she went into her home and she actually stayed in her home for about six years. She was afraid to go out. She was afraid Mungiki would get her if she got a job, so she hid in her home. She was afraid to go out to the market. And in fact, when no one else was home, she was afraid to be alone, so she went and stayed at a friend's house that she thought was safe. And sometimes Mungiki came to her house and broke in. And she had to hide underneath the bed and pull wood piles around her. So I believe this does show past persecution and also the idea that Mungiki was really targeting her and looking for her. I would also like to point out that I believe the BIA relied on the fact that she had not submitted an application yet to overcome the one-year rule. There is no deadline for an adjustment of status application and they tried to take that in. The test actually is reasonableness, which is in the government's own training manual at the record at 358. Thank you. The case just argued is submitted. I thank both counsel for your argument this morning. The case next on the calendar for argument will be United States v. Wright.
judges: McKeown, W. Fletcher, Bybee